1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JON ERIC HOLLEY,

11              Petitioner,              No. CIV S-02-0310 RRB JFM P

12        vs.

13   MICHAEL YARBOROUGH,

14              Respondent.            <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16          Petitioner is a former state prisoner proceeding through counsel with a petition for

17   a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted on February 26,

18   1999, of felony offenses for lewd and lascivious conduct with a child under 14, and misdemeanor

19   offenses for child molestation and indecent exposure.  Petitioner was sentenced to eight years in

20   state prison.

21          Petitioner claims that the trial court violated his right to a fair trial and to present a

22   defense by excluding evidence that the victim (Raina) had told certain defense witnesses that

23   other people had committed, or attempted to commit, sexual misconduct with her.  Petitioner

24   also claims that the trial court violated his federal constitutional right to due process by

25   improperly admitting irrelevant character evidence, specifically, evidence showing petitioner had

26   possessed both sexually explicit material and weapons.  Petitioner contends that the trial court

1

1  erred by instructing the jury regarding consciousness of guilt pursuant to CALJIC No. 2.03

2  because it reduced the prosecution's burden of proof, depriving petitioner of his federal

3  constitutional right to a fair trial and to due process.  Finally, petitioner alleges that the admission

4  of evidence of his alleged battery of Renie Manville violated his federal due process rights.

5        After review of the record in this action, including the lodged records of the state

6  court, this court finds that the trial court made multiple evidentiary errors raising grave doubt that

7  petitioner received a fair trial.  Accordingly, this court has determined that the petition for writ of

8  habeas corpus should be granted.

9                                    PROCEDURAL BACKGROUND

10        1.  Petitioner was arrested on August 2, 1998 and charged with five felony counts

11  of lewd and lascivious acts on a child under 14 years of age, one felony count of making terrorist

12  threats, two felony counts of child endangerment, two misdemeanor counts of molesting a child,

13  one misdemeanor count of contributing to the delinquency of a minor, and one misdemeanor

14  count of indecent exposure.  (CT 128-34 (Information filed October 7, 1998).)

15        2.  Jury trial began on February 17, 1999.  When evidence closed, the prosecution

16  moved to dismiss one count of lewd and lascivious acts, both child endangerment counts, and the

17  count of contributing to the delinquency of a minor.  (CT 183; RT 1184.)

18        3.  The jury deliberated for 13-1/2 hours.  On February 26, 1999, petitioner was

19  convicted of two counts of lewd and lascivious acts, two counts of child molesting, and one

20  count of indecent exposure.  (CT 272-83.)  Petitioner was acquitted of two counts of lewd and

21  lascivious acts and the lesser included offense of assault as to both those counts, and the terrorist

22  threats charge.  (Id.)

23        4.  The trial judge ordered a psychological evaluation prior to sentencing.  (CT

24  273; RT 1326.)  Dr. Eugene Roeder reported that petitioner was not a pedophile, but opined his

25  chronic alcoholism posed a potential public safety risk.  (CT 288-91.)

26  /////

1      5.  Petitioner was sentenced on April 28, 1999 to an aggregate term of eight years.

2      6.  On October 31, 2000, the California Court of Appeal, Third Appellate District,

3  affirmed petitioner's conviction and sentence.

4      7.  Petitioner filed a petition for review in the California Supreme Court, raising

5  the same claims he raised on appeal.  On January 17, 2001, the California Supreme Court denied

6  the petition for review.

7      8.  On March 7, 2002, petitioner filed an amended petition for writ of habeas

8  corpus in the instant petition, which contains the same claims petitioner raised in the California

9  Supreme Court.

10                          FACTUAL BACKGROUND[1]

11          After Nicky Van Suydam and [petitioner] met at an Alcoholics
             Anonymous meeting, they became friends and sometimes lovers.
12          On August 2, 1998, Nicky asked [petitioner] to baby-sit her
             children, 11-year old Raina and 10-year old Matthew, while she
13          worked a double shift at the Killer Chicken restaurant.  Raina and
             Matthew both knew and liked [petitioner], and had previously
14          spent time with him at his home. [Petitioner] agreed to baby-sit
             Raina and Matthew, picked them up from the Killer Chicken and
15          took them to his home.  Initially, the kids were having fun with
             [petitioner], watching television, playing with [petitioner's] dog,
16          and telling jokes.  One of the jokes made Raina laugh so hard she
             wet her pants.

17
             After speaking with Nicky, [petitioner] drove Raina and Matthew
18          home so Raina could change her clothes.  On the drive from
             [petitioner's] home to Raina's home, Raina sat on [petitioner's] lap
19          steering the car while he operated the pedals.  Raina testified
             during this trip, [petitioner] rubbed her legs and breasts.[2]
20          [Petitioner] testified Raina was not on his lap, but sitting on the
             seat next to him, off to his right.  He denied touching her
21          anywhere, except on her shoulders when the car was stopped.

22  /////

23  _____

24      [1]  The following summary is drawn from the October 31, 2000 opinion by the California
    Court of Appeal, Third Appellate District, in People v. Holley, C032580, at 2-8, appended as
25  Attachment 3 to Respondent's Answer (hereinafter "Opinion").

26      [2]  Raina also testified upon questioning by the court that [petitioner] did not touch her "in
    [a] way she felt funny about" on this trip.

                                        3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Raina changed from her soiled pants into shorts and they all drove back to [petitioner's] house. Raina got on [petitioner's] lap and steered the car again, sitting on his right leg with both her legs between his. [Petitioner] had his arm around her waist, and helped her steer the car. Raina testified [petitioner] put his hand up the bottom of her shorts, and rubbed her legs and breasts. [Petitioner] again denied touching Raina, except to place his hands on her shoulders when they were at stoplights.

Shortly after returning to [petitioner's] home, Raina, Matthew and [petitioner] went to a liquor store where [petitioner] bought some candy and ice cream for the kids and some peppermint Schnapps for himself. On the trip from [petitioner's] house to the liquor store, Raina again sat on [petitioner's] lap, steering the car. Raina testified [petitioner] put his hands under her shirt, touching her breasts, and under her shorts, touching her buttocks.

After making their purchases, the trio headed back to [petitioner's] house, with Raina again sitting on [petitioner's] lap, steering the car. Raina testified she did not remember if [petitioner] touched her on this trip. [Petitioner] again denied touching Raina, except to place his hands on her shoulders at stoplights so she would believe she was driving the car.

Back at [petitioner's] house, the children played, while [petitioner] laid on the couch watching television. Raina sat on [petitioner's] stomach. He put his hands on her legs, holding her to him and preventing her from getting up, for about a minute.

Raina went back outside and Matthew stayed inside talking with [petitioner]. Raina testified that when she came back inside, [petitioner] asked her to take off her clothes. Raina refused, and [petitioner] pulled his shorts to the side and exposed his testicles to Matthew and Raina. Raina turned away from [petitioner], toward a glass case with a mirror behind it. In the mirror's reflection, she could see [petitioner's] apparently erect penis coming out of the top of his shorts. Raina also saw an old gun and some knives in the glass case. [Petitioner] denied exposing himself to Matthew and Raina. And, although he was not wearing underwear at the time, he thought it unlikely they could see his genitals accidentally.

Raina, Matthew and [petitioner] went back outside and were "roughhousing." Raina and Matthew were having a contest to see who could punch [petitioner] the hardest. At some point during this contest, [petitioner] picked Raina up, cradled her in his arms and squeezed her. Raina, who has a heart condition, began to have trouble breathing. Both Raina and Matthew told [petitioner] to put her down. Matthew called [petitioner] a "motherfucker." [Petitioner] got angry with the children because of Matthew's language and took them back to their mother at the Killer Chicken.

4

Raina testified that in the car on the way back to the Killer Chicken [petitioner] threatened to kill them.  Both Raina and Matthew were afraid [petitioner] might do something to them.[3]  At first Raina believed he was going to kill them, but by the time they got to the Killer Chicken, just a few minutes later, she realized it was probably just a figure of speech.  [Petitioner] agreed he was angry with the children, but denied ever having threatened them in any way.

Nicky got off work early and drove the children home.  During the ride home, Matthew and Raina told her parts of what had happened with [petitioner].  Based on their accounts, Nicky called the police.  Officer Schouten responded to the call, and interviewed Nicky, Raina and Matthew.  The details of the children's testimony were largely consistent with the statements given to Officer Schouten.

Later in the evening, Officer Schouten interviewed [petitioner] at the police station. [Petitioner's] statements to Officer Schouten were also largely consistent with his trial testimony.

There were, however, some discrepancies between [petitioner's] initial statements to Officer Schouten and facts later revealed or admitted by [petitioner].  [Petitioner] initially told Officer Schouten that after he picked the kids up from the Killer Chicken and brought them to his house, the only other place he went with them was back to the Killer Chicken to drop them off.  He did not tell the officer about either the trips back and forth to the children's home or to the liquor store.  Officer Schouten asked [petitioner] whether he had any guns in his home. [Petitioner] first admitted, then denied having guns.  On the stand, [petitioner] admitted he lied to Officer Schouten about having guns in the house.  Also in his interview with Schouten, [petitioner] admitted having a knife collection in the house, but described all the knives as having tiny blades.  At trial he admitted the collection included a dive knife, and not all of the knives are small.

The four driving incidents and holding Raina to his stomach resulted in five counts of lewd and lascivious acts on a child under age 14. (§ 288, subd. (a).)  Soliciting Raina to remove her clothes and exposing his genitals to Raina formed the basis for two misdemeanor counts of annoying or molesting a child under 18. (§ 647.6.)  Asking Matthew to help him expose his genitals to Raina resulted in one count of contributing to the delinquency of a minor.[4]  Exposing his testicles to Matthew and Raina resulted in

---

[3]  Matthew did not, however, testify that [petitioner] threatened to kill them.  Rather, his fear was "[b]ecause after calling a grownup a bad word, I expect they're going to do something."

[4]  It was alleged [petitioner] asked Matthew to help him expose his genitals to Raina.  As the prosecution dismissed this count, the facts underlying it are not delineated here.

one count of indecent exposure. (§ 314, subd. 1.)  Picking Raina up and squeezing her chest, knowing she had a heart condition, provided the basis for two counts of child endangerment. (§ 273a, subd. (a).)  Threatening to kill the children on the way to the Killer Chicken resulted in one count of terrorist threats. (§ 422.)

During the prosecution's case-in-chief, [petitioner] objected to the admissibility of a number of items seized from his home, pursuant to a warrant.[5]  He objected to the admission of guns seized from a bedroom, rifles seized from his living room, and a knife collection. The trial court ruled any guns found in the front room and old weapons "near or about" the glass case were admissible.  However, any weapons found in the bedroom, or guns, which could not fit in the glass case, were not.  The court also ruled the knives were admissible, to the extent they were found in the cabinet.  The court ruled these weapons were admissible to substantiate the children's fear as to [petitioner's] threat to kill them and to support Raina's credibility.

[Petitioner] also objected to the admission of "a couple of dirty magazines" seized from his bedroom.[6]  The court tentatively indicated that on the facts of the case, it believed the magazines would be relevant, but agreed they should not be shown to the jury until the court ruled they were admissible.

Although these items were marked for identification, they were not admitted into evidence until both sides rested their cases.[7]  In addition, neither the titles nor the contents of the magazines were revealed to the jury, during the prosecution's case-in-chief.

[Petitioner] sought to impeach Raina's credibility through the testimony of two neighborhood children and their mother.  The prosecution filed a motion in limine, objecting to this proposed testimony.  The court held a hearing pursuant to Evidence Code section 402, at which Scott Westfall, Christa Westfall, and their mother, Shellie Deaton each testified.  After hearing their proposed testimony, the court limited the testimony of these witnesses.  Each could testify as to Raina's credibility and truthfulness, but none

/////

---

[5]  This objection immediately preceded the testimony of the officer who seized the items, and the items being marked for identification.

[6]  The characterization of these magazines as "dirty" magazines came from defense counsel, outside the presence of the jury.

[7]  The three magazines and the matchbook were ultimately admitted into evidence and the jury room for consideration by the jury. (RT 793-94; see also RT 707.)  Defense counsel was allowed to re-open his case and present petitioner's testimony that petitioner also possessed magazines depicting more mature women, for example, Penthouse and Playboy. (RT 1219-20.)

could testify about Raina having made references to sex or sexual conduct of others.

After both sides rested their cases, the prosecution moved to dismiss the charges relating to Raina sitting on [petitioner's] stomach (§ 288, subd. (a)), asking Matthew to help him expose his genitals to Raina (§ 272), and the two child endangerment counts (§ 273a, subd. (a)).  This motion was granted.

Upon receiving the case, the jury deliberated for 13 ½ hours. [Petitioner] was acquitted on two counts of lewd and lascivious conduct and the terrorist threats charge.  He was convicted on the two remaining counts of lewd and lascivious conduct, the two counts of misdemeanor child molestation, and the count of indecent exposure.

(Opinion, at 2-8.)

I.  <u>General Standards</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a decision'" of the  Supreme Court and nevertheless arrives at different result.  <u>Early v. Packer</u>, 573 U.S. 3, 8 (2002) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

1   prisoner's case.  <u>Williams</u>, 529 U.S. at 413.  A federal habeas court "may not issue the writ

2   simply because that court concludes in its independent judgment that the relevant state-court

3   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

4   application must also be unreasonable."  <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75

5   (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

6   question, is left with a 'firm conviction' that the state court was 'erroneous.'")

7           The court looks to the last reasoned state court decision as the basis for the state

8   court judgment.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

9   reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

10  habeas court independently reviews the record to determine whether habeas corpus relief is

11  available under section 2254(d).  <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000).

12  II.  Petitioner's Claims

13          a.  Exclusion of Evidence

14          Citing <u>Chambers v. Mississippi</u>, 410 U.S. 284, 294 (1973) and <u>Crane v. Kentucky</u>,

15  476 U.S. 683, 690-91 (1986), petitioner claims that the trial court violated his right to present

16  witnesses in his own defense when it excluded the proffered testimony of Christa Westfall, a

17  former neighbor and classmate of Raina's, and Scott Westfall, Christa's teenaged brother.

18          When applying AEDPA and reviewing whether a state court decision is contrary

19  to federal law, this court must "look to the state's last reasoned decision – in this case [the

20  California Court of Appeal's decision] – as the basis for its judgment."  <u>Avila v. Galaza</u>, 297

21  F. 3d 911, 918  & n.6 (9th Cir. 2002).  The California Court of Appeal described the background

22  to this claim as follows:

23          At the Evidence Code section 402 hearing on this issue, Scott and
            Christa Westfall, and their mother, Shellie Deaton[,] testified.
24          Scott, a 14-year old, testified Raina had told him she and her

25  /////

26  /////

8

boyfriend had done "weird stuff" in a bedroom closet.[8]  She did not
tell him her boyfriend's name nor did she mention sex being
involved in this "weird stuff."  Twelve-year old Christa testified
Raina had told her that a neighborhood boy wanted to "hump her
brain into little pieces."  Christa also testified Raina told her
Matthew had gotten into bed with her and tried to have sex with
her.  Raina, however, never told Christa specifically what Matthew
did.  Christa also testified Raina lied a lot.  Shellie testified she
heard of these comments by Raina when defense counsel
interviewed her children.  Shellie also testified Raina had lied to
her about her mother's drinking at her mother's request.

The trial court ruled these witnesses could testify to impeach
Raina's credibility, but such testimony would be limited.  Scott
could testify only that Raina had used the phrase "weird stuff," a
phrase she denied using during cross-examination.  Scott could not,
however, testify about an unnamed boyfriend and the bedroom
closet.  Christa could testify Raina lied a lot, but not about the
unnamed neighborhood boy or about Matthew trying to have sex
with Raina.  Shellie could testify Raina had lied to her at her
mother's behest.

As to Scott's testimony, the trial court noted Raina never
mentioned sex and he did not want the jury to make such an
inference, particularly since for an 11-year old "[w]eird stuff can be
anything."  The court also indicated on cross-examination of
Raina, defense counsel could inquire into "what weird stuff might
have meant . . . ."  As to Christa's testimony, the trial court ruled,
even assuming Raina had made the statements about her brother
and the neighbor, they were not relevant.

(Opinion at 9-11 (footnote 8 omitted).)

On direct appeal, the Third District Court of Appeal reviewed the trial court's

Evidence Code § 402 hearing and "interpret[ed] the court's remarks as a finding the evidence

was of questionable, if any, relevance, had the potential for being unduly prejudicial, and [was]

not sufficiently probative of any issue in the trial to warrant the consumption of time."  (Opinion

at 11.)  The appellate court then reviewed the trial court's decision and found there was no abuse

---

[8]  At the hearing, defense counsel argued Raina's use of the phrase "weird stuff" was
relevant because the district attorney had used the term when questioning Raina about
[petitioner's] conduct, and she had responded with sexual conduct.  During direct examination,
the district attorney asked Raina if "weird things" or "weird stuff" happened.  Sometimes this
referred to sexual conduct and sometimes not.

1   of discretion.  In evaluating [petitioner's] arguments, the appellate court found that there was "no

2   evidence of the falsity of Raina's statements, no indication the statements [made to friends of her

3   age about friends of her age] were intended as accusations, and significant dissimilarities

4   between the type of 'accusations' made to Scott and Christa and those made against [petitioner]."

5   Id. at 14.  Moreover, the appellate court noted that the trial court did not bar these witnesses from

6   testifying; rather, the trial court allowed them to impeach Raina's credibility but limited how they

7   could do so:  "Shellie testified Raina had lied to her when Nicky told Raina to lie.  Christa

8   testified Raina 'usually tells lies.'  Defense counsel elected not to call Scott."  (Opinion at 13-14.)

9          The appellate court found the proposed testimony proffered at the § 402 hearing

10  was not relevant to show Raina's 'tendency to fabricate sexual accusations . . .'" (opinion at 14),

11  and held the trial court's decision to exclude these statements was not error.  (Id.)

12         The right to confront witnesses, guaranteed by the Sixth and Fourteenth

13  Amendments, includes the right to cross-examine witnesses to attack their general credibility or

14  show their possible bias or self-interest in testifying.  Davis v. Alaska, 415 U.S. 308, 316 (1973);

15  Olden v. Kentucky, 488 U.S. 227 (1988); Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986).

16  The Ninth Circuit Court of Appeal recently recounted Supreme Court authority that elucidates

17  the right to cross examination:

18         First, "the right to cross-examine includes the opportunity to show
           [not only] that a witness is biased, [but also] that the testimony is
19         exaggerated or [otherwise] unbelievable." Pennsylvania v. Ritchie,
           480 U.S. 39, 51-52, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)
20         (plurality); see also Delaware v. Fensterer, 474 U.S. 15, 22, 106
           S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam) ("[T]he
21         Confrontation Clause is generally satisfied when the defense is
           given a full and fair opportunity to probe and expose [testimonial]
22         infirmities[such as forgetfulness, confusion, or evasion] through
           cross-examination, thereby calling to the attention of the factfinder
23         the reasons for giving scant weight to the witness' testimony.");
           Davis, 415 U.S. at 316, 94 S.Ct. 1105 ("[T]he cross-examiner is ...
24         permitted to delve into the witness' story to test the witness'
           perceptions and memory, [and] ... has traditionally been allowed to
25         impeach, i.e., discredit, the witness."). Thus, cross-examination
           may implicate the Sixth Amendment without implying conscious
26         or malicious fabrication on the part of the witness so long as it

otherwise bears on the witness's reliability or credibility. <u>See Van Arsdall</u>, 475 U.S. at 680, 106 S.Ct. 1431. For example, in <u>Davis</u>, the defendant sought to cross-examine a prosecution witness regarding the fact that, at the time he identified the defendant to the police, he was on probation after having been adjudicated a juvenile delinquent. <u>Davis</u>, 415 U.S. at 309-11, 94 S.Ct. 1105. In so doing, the defense sought to show not that the prosecution witness consciously or maliciously lied, but that he might have made a "hasty and faulty identification" of the defendant to shift suspicion away from himself, or that he might have been subject to "undue pressure" from the police resulting from fear of possible probation revocation. <u>Id.</u> at 311, 317-18, 94 S.Ct. 1105. The Supreme Court held that the precluded cross-examination came within the ambit of the Sixth Amendment. <u>Id.</u> at 317-18, 94 S.Ct. 1105.

Second, cross-examination may implicate the Sixth Amendment even if it is not certain to affect the jury's assessment of the witness's reliability or credibility. <u>See Davis</u>, 415 U.S. at 317, 94 S.Ct. 1105(refusing to "speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted th[e] [defendant's] line of reasoning had counsel been permitted to fully present it," but nevertheless concluding that the trial court violated the defendant's Sixth Amendment right to cross-examination by precluding the proffered cross-examination). Rather, it is sufficient that a jury "might reasonably" have questioned the witness's reliability or credibility in light of the cross-examination. <u>Van Arsdall</u>, 475 U.S. at 679, 106 S.Ct. 1431; <u>see also Olden</u>, 488 U.S. at 232, 109 S.Ct. 480 (1988) (quoting <u>Van Arsdall</u>, 475 U.S. at 680, 106 S.Ct. 1431); <u>Van Arsdall</u>, 475 U.S. at 680, 106 S.Ct. 1431 (holding that the defendant "state[d] a violation of the Confrontation Clause" where "[a] reasonable jury might have received a significantly different impression of [the prosecution witness's] credibility had [the defendant's] counsel been permitted to pursue his proposed line of cross-examination"); <u>Davis</u>, 415 U.S. at 319, 94 S.Ct. 1105(concluding that the trial court violated the defendant's Sixth Amendment right to cross-examination where "[s]erious damage to the strength of the State's case would have been a real possibility had [the defendant] been allowed to pursue [the proffered] line of inquiry").

<u>Fowler v. Sacramento County Sheriff's Dept.</u>, 421 F.3d 1027, 1035-36 (9th Cir. 2005).

However, the defendant's Sixth Amendment rights "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process," so long as those restrictions are not "arbitrary or disproportionate to the purposes they are designed to serve." <u>Michigan v. Lucas</u>, 500 U.S. 145, 149, 151 (1991).  The trial court has discretion to limit cross-

examination to prevent harassment, prejudice, confusion of the issues, danger to witnesses or interrogation that is repetitive or only marginally relevant.  Van Arsdall, 475 U.S. at 679; see also Wood v. Alaska, 957 F.2d 1544, 1551-52 (9th Cir. 1992).  Said restrictions, however, must be "reasonable," Van Arsdall, 475 U.S. at 679, and "'may not be arbitrary or disproportionate to the purposes they are designed to serve.'"  Lucas, 500 U.S. at 151, quoting Rock, 483 U.S. at 56. The Supreme Court has held that a defendant's Sixth Amendment right to cross-examination was violated when the trial court prohibited all inquiry into an event the prosecution conceded had occurred and a jury might reasonably have found to bear on a witness' reliability or credibility. Van Arsdall, 475 U.S. at 676, 679.  The Ninth Circuit Court of Appeals has also found such violation.  Fowler, 421 F.3d at 1027 (state court's ruling precluding cross-examination of victim as to prior accusations she had made was an objectively unreasonable application of clearly established federal law and a violation of defendant's Confrontation Clause rights; erroneous preclusion of such cross-examination was not harmless); Franklin v. Henry, 122 F.3d 1270, 1273 (9th Cir. 1997), overruled in part, on other grounds, Payton v. Woodford, 346 F.3d 1204, 1218 (9th Cir. 2003)(en banc).[9]

Here, the defense offered evidence of the victim's precociousness concerning matters of a sexual nature and her belief that others desired her in a sexual way.  Specifically, the testimony of the Westfall children was offered to show Raina had a sexually active imagination and tended to fabricate and/or exaggerate sexual incidents.

The appellate court interpreted the trial court's preclusion of this evidence as a finding that even if the proffered evidence had any relevance, which was questionable, the proffered evidence was inadmissible under California Evidence Code § 352 because the evidence had the potential of undue prejudice and was not sufficiently probative to warrant the consumption of time.  (People v. Holley, slip op. at 11.)  The appellate court found the trial court

---

[9]  The Payton court overruled Franklin on the issue of the burden of proof under Brecht v. Abrahamson, 507 U.S. 619 (1982).  See Payton, 346 F.3d at 1218.

1   had not abused its discretion.  This court must now determine whether the trial court's preclusion

2   of the cross-examination was an objectively unreasonable application of the above Supreme

3   Court precedent.  This court must consider "first whether the proffered cross-examination

4   sufficiently bore upon [the victim's] reliability or credibility such that a jury might reasonably

5   have questioned it, and, if so, whether the trial court's preclusion of this cross-examination was

6   unreasonable, arbitrary or disproportionate given its concerns about waste of time . . . and

7   prejudice."  Fowler, 421 F.3d at 1038.  In addressing a criminal defendant's Sixth Amendment

8   challenge to exclusion of evidence that a child victim suffered past sexual abuse by others, a

9   court must balance the interests in the particular case, considering whether the relevance of the

10  evidence is outweighed by other considerations.  LaJoie v. Thompson, 217 F.3d 663, 670-71 (9th

11  Cir. 2000)(application of rape shield law to exclude evidence of prior abuse of child victim

12  violated Sixth Amendment, requiring habeas relief under AEDPA); Lucas, 500 U.S. at 145;

13  Wood, 957 F.2d at 1549.

14          The appellate court found that the excluded evidence was not sufficiently

15  probative because the defense failed to establish the excluded statements were, in fact, false.

16  However, that argument is flawed.  First, Raina might have admitted the prior statements were

17  false.[10]  Second, the victim need not admit the falsity of the prior accusations.  See, e.g., Franklin,

18  122 F.3d at 1273 (noting appellate court's statement that prior accusation would be relevant if

19  jury found it to be false); People v. Adams, 198 Cal.App.3d 10, 16 (1988)(defense offered third

20  party testimony to establish victim made prior accusation and it was false).

21          The state court erred in characterizing the prior conduct as dissimilar to the

22  allegations against petitioner.  Here, the evidence was relevant to show Raina was precocious

23  about matters of a sexual nature and had previously made statements that other people wanted to

24  have sex with her.  LaJoie, 217 F.3d at 671 (such evidence is relevant to provide an alternative

25

26          [10]  Although the trial court held an *in camera* hearing to inquire how the Westfall children
    were prepared to testify, it did not so inquire of Raina.

13

explanation for precocious sexual knowledge or injury).  Because Raina was only 11, these

statements were relevant to show she had a sexually active imagination and a tendency to

fabricate and/or exaggerate sexual incidents.  These statements went directly to her credibility

and reliability concerning her view that petitioner had touched her in a lewd and lascivious

manner.  This evidence was critical for the petitioner to be able to cross-examine the victim so

the jury could accurately adduce her credibility concerning claims of alleged sexual misconduct.

Because the defense theory was that Raina made up these allegations and exaggerated other

behavior by petitioner to make it seem sexually abusive, this evidence went to the heart of the

defense case.  The evidence was highly relevant.[11]

The trial court's determination the evidence would be time-consuming was

unfounded based on the length of time the *in camera* hearing took.  (RT 302-14.)  The number of

excluded statements was small, so cross-examination would not have taken that long.  The

excluded testimony was just as reliable as the testimony of Raina and Matthew, and the jury

could assess their credibility in the same way they were called upon to assess the credibility of

Raina and Matthew.  The nature of the evidence did not concern overt sexual activity on Raina's

part, so questioning would not have been traumatic for Raina.

Admitting the evidence would not have created undue prejudice.  See LaJoie, 217

F.3d at 673 (evidence of an adult or sexually-mature minor's sexual history differs from evidence

concerning non-consensual sexual abuse of a young child, and jury is unlikely to draw an

unfavorable and unwarranted impression of the victim from the latter type of evidence).  If the

evidence convinced the jury Raina lacked credibility, that conclusion would have been

warranted, rather than the product of moralistic preconceptions.  The unlikeliness of prejudice

distinguishes this case from Wood, 957 F.2d at 1549 (evidence rape victim told the accused she

---

[11]  Arguably, the trial court found the evidence relevant because it invoked California
Evidence Code § 352 and held an *in camera* hearing to weigh the probative value of the evidence
against its prejudicial effect.  (RT 628; 661.)

was nude model and actress in pornographic videos was properly excluded because it would

likely have encouraged the jury to "feel hostility for her as an immoral woman"). The relevance

of the evidence greatly outweighed the state's interest in exclusion.

The Ninth Circuit's decisions in Franklin and Fowler are on point and persuade

this court that the state court's determination was an objectively unreasonable application of

clearly established Confrontation Clause law, as set forth by the United States Supreme Court in

Crane, 476 U.S. 690-91; Davis, 415 U.S. at 308 and Olden, 488 U.S. at 227. In Franklin, the

court on habeas found error of constitutional magnitude where the trial court excluded evidence

the alleged victim previously accused her mother of sexual abuse ("lick[ing] her private") similar

to that for which defendant was convicted. Id., 122 F.3d at 1272. This was so even though the

victim did not admit the accusation against her mother was false and her credibility was

impeached through other evidence. Id. In Fowler, the court on habeas review found error of

constitutional magnitude where the trial court precluded Fowler from cross-examining the victim

regarding two prior incidents in which she alleged that other men had molested her, even though

the prior incidents were not identical. Fowler, 421 F.3d at 1027. This was so even though "the

trial court concluded that there was no 'indication' that [the victim] actually overreacted or lied

in the prior incidents and that the facts of the prior incidents were 'very dissimilar' from those

here." Id., at 1039. The Fowler court found that "there can be no doubt that the precluded cross-

examination sufficiently bore on [the victim's] reliability or credibility such that a jury might

reasonably have questioned it." Id.

Here, as in Franklin and Fowler, the excluded evidence in the instant case

sufficiently bore on Raina's credibility or reliability such that a jury might reasonably have

questioned it. Exclusion of the evidence deprived petitioner of the "basic right to have the

prosecutor's case encounter and survive the crucible of meaningful testing." Franklin, 122 F.3d

at 1273 (internal quotations omitted). Although the excluded evidence was not identical to the

allegations in this case, it provided a context for Raina's knowledge of sex and her apparent

belief that others desired to have sex with her, which would shed light on how Raina interpreted certain acts by petitioner.

That the victim's testimony was partially corroborated by Matthew does not render the error harmless.  See Chapman v. California, 386 U.S. 18, 24 (1967).  Petitioner's constitutional right to put on an effective defense and confront those who testified against him outweighed the arguments made by the prosecution.  The scales do not tip in favor of the state on the facts of this case.  Moreover, a close review of Matthew's testimony demonstrates that the corroboration was partial at best.

First, Matthew's recollection of the events was weak.  He admitted that Raina told him what happened and he agreed.  (RT 535.)  Matthew also admitted that he had viewed the videotape of his interview with a victim advocate from the local Sexual Assault Response Team two times, once the very day he testified, to help him remember the events at issue.  (RT 549-50.)  "I remembered it from my movie," he said at one point.  (RT 550.)  During many of the trips in the car it was undisputed that Matthew sat in the back seat of the car.  Matthew confirmed he had discussed his testimony with the prosecution, with his mother, Nicky, with Raina and the victim advocate.  (RT 535.)

Second, his recollection of certain basic events deviated from that of Raina.  For example, his recollection of the trips in the car differed in number and order.  Matthew recalled seven trips in the car, Raina recalled six.  Matthew testified that petitioner, Raina and Matthew took the following trips in the car:

(1) Killer Chicken to petitioner's house.  (RT 479, 523.)

(2) Petitioner's house to the liquor market.  (RT 480)  First, Matthew claimed petitioner inappropriately touched Raina on this trip (RT 503), then Matthew said nothing happened on this trip.  (RT 528.)

(3)  Liquor market to petitioner's house (RT 480.) Matthew later stated this was the first trip he saw petitioner's hands in Raina's shirt.  (RT 550.)

16

1     (4) Petitioner's house to Raina's house, after Raina wet her pants.  (RT 480.)

2     (5) Raina's house to liquor market.  (RT 480.)

3     (6) Liquor market to petitioner's house.  (RT 481.)

4     (7) Petitioner's house to Killer Chicken.  (RT 487.)

5     Raina testified that they took the following trips in the car:

6     (1) Killer Chicken to petitioner's house.  (RT 405.)

7     (2) Petitioner's house to Raina's house after she wet her pants.  (RT 406.)

8     (3) Raina's house to petitioner's house.  (RT 406.)

9     (4) Petitioner's house to liquor market.  (RT 407.)

10     (5) Liquor market to petitioner's house.  (RT 408, 426.)  Raina testified she didn't

11 recall any touching during this trip.  (RT 426.)

12     (6) Petitioner's house to Killer Chicken.  (RT 409.)

13 Matthew's testimony also differed with respect to what they did after returning to Killer Chicken

14 the last time that day.  Matthew said they went to JJ's Pizza and played Centipede for two hours

15 and a friend took him and his family home.  (RT 543-44.)  Raina testified that her mother drove

16 them home shortly after petitioner returned them to Killer Chicken.  Matthew testified that

17 petitioner inappropriately touched Raina on every leg of each trip except the first and last (RT

18 479, 503, 480, 481); Raina testified that nothing happened in the car on the way back to

19 petitioner's house from the liquor store.  (RT 426.)

20     Third, because Matthew testified to another trip to the liquor store, there was no

21 specific testimony corroborating Raina's testimony that petitioner inappropriately touched her on

22 the trip from Raina's home to petitioner's home.  Petitioner was found guilty of lewd and

23 lascivious conduct based on acts committed during that trip.  After a careful review of the record,

24 this court finds that there was corroborating evidence supporting a lewd and lascivious act on the

25 trip from petitioner's home to the liquor store, but none for the trip from Raina's home to

26 petitioner's home.  However, because Matthew testified to two different trips to the liquor store,

1    it is not clear that his corroboration was attributable to the one trip on which petitioner was found

2    guilty.

3            Fourth, a review of the trial transcript reflects that Matthew was very protective of

4    his sister.  Matthew was frightened for Raina's safety when petitioner picked Raina up and

5    squeezed her, and furious with petitioner for putting Raina in danger.  Officer Schouten testified

6    that Matthew choked up and started to tear when describing this incident.  (RT 622.)  Officer

7    Schouten testified that Matthew stated he loved his sister and needed to protect her.  (RT 622.)

8    Matthew also would have shared Raina's resentment over the breakup of their mother and

9    petitioner, whom Matthew testified he had wanted for a father.  (See RT 522.)  Matthew's

10   protective feelings for his sister and his anger toward petitioner provided Matthew with a strong

11   motive to adopt Raina's story concerning petitioner's actions.

12           Constitutional error was committed.  This court must now address whether that

13   error had a "substantial and injurious effect or influence" on the jury's verdict.  Brecht v.

14   Abrahamson, 507 U.S. 619, 637 (1993).  The prosecution's case hinged on the testimony of

15   Raina, age 11, and her 10 year old brother, Matthew.  There was no physical evidence.

16           The excluded evidence related to the victim's credibility, but also related to

17   whether petitioner touched the proscribed areas of Raina's body and whether or not petitioner

18   had the lewd intent necessary for the convictions.  The theory that Raina was precocious about

19   sexual matters and believed other people wanted to have sex with her went to the heart of

20   petitioner's defense.  Without the excluded evidence, the jury was unable to accurately determine

21   Raina's credibility and reliability with respect to these charges.

22           The trial court conscientiously carried out its duty to protect Raina under the

23   state's rape shield laws.  However, Raina's reliability and credibility was critical to the

24   conviction, and the jury might have been persuaded that Raina fantasized about sex had the

25   excluded evidence been admitted.  The jury deliberated over 13 hours and found petitioner guilty

26   of two counts of lewd and lascivious conduct and not guilty of two counts of lewd and lascivious

1  conduct.  The jury considered all the evidence of record carefully and the exclusion of this

2  evidence might well have tipped the scales in petitioner's favor.  This court is in grave doubt as

3  to the effect of the error, and "petitioner is entitled to the benefit of the doubt."  <u>Payton</u>, 346 F.3d

4  1217-28; <u>O'Neal v. McAninch</u>, 513 U.S. 432 (1995).

5          Thus, the state court's determination was an objectively unreasonable application

6  of clearly established Confrontation Clause law, as set forth by the United States Supreme Court

7  in <u>Crane</u>, <u>supra</u>, <u>Davis</u>, <u>supra,</u> and <u>Olden</u>, <u>supra</u>.  This claim should be granted.

8              b.  Improper Admission of Character Evidence

9          Petitioner also claims that the trial court violated his federal constitutional right to

10  due process by improperly admitting irrelevant character evidence, specifically, evidence

11  showing petitioner had possessed both sexually explicit material and weapons.

12          The question whether evidence was properly admitted under California law is not

13  cognizable in this federal habeas corpus proceeding.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991).

14  The only question before this court is whether the trial court committed an error that rendered the

15  trial so arbitrary and fundamentally unfair that it violated federal due process.  <u>Id.</u>  <u>See</u> <u>also</u>

16  <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991) ("the issue for us, always, is whether

17  the state proceedings satisfied due process; the presence or absence of a state law violation is

18  largely beside the point").  Evidence violates due process only if "there are no permissible

19  inferences the jury may draw from the evidence."  <u>Jammal</u>, 926 F. 2d at 920.  Even then,

20  evidence must "be of such quality as necessarily prevents a fair trial." <u>Id.</u> (quoting

21  <u>Kealohapauole v. Shimoda</u>, 800 F.2d 1463 (9th Cir. 1986)).  For purposes of AEDPA, petitioner

22  must demonstrate that the California courts' rejection of his federal due process claim was

23  contrary to or an unreasonable application of "clearly established Federal law, as determined by

24  the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1);  <u>Lockyer v. Andrade</u>, 538 U.S.

25  63, 70-71 (2003).

26  /////

1    On collateral review, an error is not "harmless" if it "had substantial and injurious

2  effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.  In determining

3  whether an error is harmless, "the question is not 'were they [the jurors] right in their judgment,

4  regardless of the error or its effect on the verdict.  It is rather what effect the error had or

5  reasonably may be taken to have had upon the jury's decision.' "  Wade v. Calderon, 29 F.3d

6  1312, 1322 (9th Cir.1994) (quoting Brecht, 507 U.S. at 642-43 (Stevens, J., concurring),

7  overruled on other grounds by Rohan ex rel. Gates v. Woodford, 334 F.3d 803, 815 (9th Cir.

8  2003).)  An error is not harmless if we are "in grave doubt" as to whether the error had

9  "substantial and injurious effect or influence."  O'Neal, 513 U.S. at 435.

10                          i.  Admission of Sexually Explicit Materials

11    The sexually explicit materials at issue were a matchbook cover titled "When I

12  was a Year Old," which depicted a child with unnaturally large genitals, and three magazines

13  entitled "Barely Legal," "Baby Face," and "Barely 18."  (Opinion at 16.)  The appellate court

14  reviewed this claim under an abuse of discretion standard and found that the "sexually explicit

15  materials were at least slightly probative of [petitioner's] intent to commit lewd and lascivious

16  acts with Raina."  (Opinion at 15-16.)  The appellate court stated that it "was possible for the jury

17  to infer [petitioner] had a sexual attraction to young women, and possibly children, and intended

18  to act on that attraction" (opinion at 16), and found that this intent was "relevant to an element of

19  the crime charged."  (Id.)

20    The appellate court further found that this evidence:

21      tended to rebut the testimony of [petitioner] and his girlfriend,
       Renie Manville.  [Petitioner] testified his sexual interests were
22      geared to "mature" women.  Renie testified there was nothing
       strange about [petitioner's] sexual practices and he had never
23      shown any inappropriate interest in children. [Petitioner] opened
       the door by putting his sexual interests and proclivities in issue.
24      These magazines were admissible as impeachment of this
       testimony.

25

26  /////

20

1   (Opinion at 16.)  The appellate court found that the trial court balanced the magazines'

2   evidentiary value against their potential prejudicial impact and held the value outweighed the

3   prejudice.  (Id. at 17.)  The court noted that the jury acquitted petitioner on two of the four counts

4   of lewd and lascivious conduct,[12] demonstrating that the effect of this evidence on the jury was

5   not unduly prejudicial.  (Id.)

6   _____ "[I]t is not the province of a federal habeas court to reexamine state-court

7   determinations on state-law questions.   In conducting habeas review, a federal court is limited to

8   deciding whether a conviction violated the Constitution, laws, or treaties of the United States."

9   Estelle, 502 U.S. at 68 (citing 28 U.S.C. § 2241; Rose v. Hodges, 423 U.S. 19, 21, (1975) (per

10   curiam )).  Because federal habeas relief does not lie for state law errors, a state court's

11   evidentiary ruling is grounds for federal habeas relief only if it renders the state proceedings so

12   fundamentally unfair as to violate due process.  Drayden v. White, 232 F.3d 704, 710 (9th Cir.

13   2000), cert. denied, 532 U.S. 984 (2001); Jammal, 926 F.2d at 919 ("The issue for us, always, is

14   whether the state proceedings satisfied due  process; the presence or absence of a state law

15   violation is largely beside the point").

16          The United States Supreme Court has expressly declined to rule on the question of

17   "whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes'

18   evidence to show propensity to commit a charged crime."  See Estelle, 502 U.S. at 75 n.5.  The

19   Ninth Circuit has held that the admission of other crimes evidence, where there were no

20   permissible inferences (other than conduct in conformity therewith) the jury could have drawn

21   from the evidence, violates due process.  See McKinney v. Rees, 993 F.2d 1378, 1384 (9th

22   Cir.1993); Jammal, 926 F.2d at 920.

23   _____

24          [12] California Penal Code § 288(a) provides:  "Any person who willfully and lewdly
     commits any lewd or lascivious act, including any of the acts constituting other crimes provided
25   for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the
     age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or
26   sexual desires of that person or the child, is guilty of a felony . . . ."  Id.

1        Here, the admission of evidence was not prior crimes-related.  Possession of adult

2   magazines or a lewd matchbook is not a crime.  Mere possession of adult magazines does not

3   tend to establish that petitioner has the intent to engage in or has engaged in lewd and lascivious

4   conduct.  See People of the Territory of Guam v. Shymanovitz, 157 F.3d 1154, 1158-59 (9th Cir.

5   1998)("[P]ossession of lawful reading material is simply not the type of conduct contemplated by

6   Rule 404(b).").  "There is simply no doubt that a wide gulf separates the act of possessing written

7   descriptions or stories about criminal conduct from the act of committing the offenses

8   described."  Shymanovitz, 157 F.3d at 1159.  There were no permissible inferences the jury

9   could draw from the fact that petitioner possessed the matchbook or these magazines; thus, the

10  admission of this evidence was error.[13]

11       Moreover, the trial court failed to instruct the jury that the magazines and

12  matchbook were only to be considered for a limited purpose, rather than to reflect on petitioner's

13  character.  The matchbook at best expressed a joke about a man's endowment and bore no

14  relevance to the facts of this case.  The admission of the matchbook and the magazines went

15  solely to petitioner's character to demonstrate that because he had a dirty mind he had a

16  propensity to commit lewd and lascivious acts against Raina.  The prosecution argued that

17  because petitioner looked at dirty magazines he had a dirty mind and because he had a dirty mind

18  he was the kind of person likely to have done what Raina claimed he did.  Without the limiting

19  instruction, this court cannot find that the jury only considered the magazines and matchbook in

20  evaluating petitioner's intent rather than finding he was a person of bad character.

21       The state appellate court's view that the magazines were admissible to impeach

22  Ms. Manville is an incorrect application of the facts.  The magazines were admitted into evidence

23  /////

24

---

25       [13]  The court notes that there were no allegations that the children had seen these
    magazines.  They were found in the nightstand (RT 794) by petitioner's bed and his bedroom
26  was off limits to the children.  (RT 380-81.)

1    during the prosecution's case-in-chief.  (RT 794; 972.)  Ms. Manville testified for the defense.

2    (RT 1059.)

3           This court must now consider whether the petitioner's conviction violated

4    constitutional norms; that is, whether the admission of the matchbook and adult magazines had a

5    substantial and injurious effect or influence in determining the jury's verdict.  <u>Brecht</u>, <u>supra</u>.

6           Petitioner relies heavily on <u>McKinney v. Rees</u>, 993 F.2d 1378, 1384 (9th

7    Cir.1993), where the court found admission of evidence that a murder defendant possessed

8    knives was irrelevant because the knives were not linked to the charged stabbing and the jury was

9    likely to misuse the evidence as propensity evidence.  Specifically, in <u>McKinney</u>, the court held

10   that the admission of other crimes evidence violated due process where:  (1) the balance of the

11   prosecution's case against the defendant was "solely circumstantial;" (2) the other crimes

12   evidence, which involved the defendant's past use of knives, was similar to the stabbing for

13   which he was on trial; (3) the prosecutor relied on the other crimes evidence at several points

14   during the trial; and (4) the other crimes evidence was "emotionally charged."  <u>McKinney</u>, 993

15   F.2d at 1381-82, 1385-86.

16          Application of the <u>McKinney</u> factors to this case leads to the conclusion that the

17   admission of the matchbook and the magazines violated due process.  First, this case was a close

18   case that came down to credibility; the kids' word against the petitioner's.  There was no physical

19   evidence, both the victim and her brother testified.  The victim's testimony varied and, as noted

20   above, the brother's testimony only partially corroborated the victim's.

21          Second, the prejudicial impact of this evidence was high.  The three magazines

22   and the matchbook were allowed to go into the jury room.  (RT 793-94; see also RT 707.)  The

23   three magazines were placed in a paper bag (RT 793) ostensibly so people would not be

24   offended.  The appellate court stated that it was clear the magazines depicted women over age 18,

25   despite titles to the contrary.  Thus, any relevance of the magazines was even more attenuated in

26   that Raina, age 11, was prepubescent and had a heart condition – the prosecution referred to her

23

1    as "a little stick of a thing." (RT at 1255.) There was no allegation that these magazines

2    contained child pornography or depicted women as young as 11.

3              The trial court permitted the defense to reopen his case and petitioner took the

4    stand and testified as to other magazines located in his nightstand that the prosecution had not

5    admitted into evidence: Penthouse, Playboy and Gallery. (RT 1219-20.) However, these

6    magazines were not similarly admitted into evidence.

7              Third, the prosecutor relied on this evidence in closing argument. "[Y]ou'll have

8    an opportunity to review the magazines - . . . why does someone have those hanging around if

9    there is not any interest? Why does he go out and get those if he doesn't have any interest in

10   women that are depicted in that way?" (RT 1252.) "As far as [Ms. Manville's] relations with

11   [petitioner], two things: the fact there was a variety of adult magazines tell us that petitioner has

12   a variety of adult sexual interests. He likes women. Apparently he likes girls. And what woman

13   wants to admit that the guy she's sleeping with gets turned on by little girls? What woman wants

14   to go there? (RT 1257-58.)

15             As noted above, there is no evidence of record that the magazines depicted

16   prepubescent girls; rather, the appellate court noted that it was "clear" that the magazines

17   depicted women over age eighteen. Petitioner testified that he bought these magazines because it

18   turns him on sexually (RT 973), but he also testified that Raina was not mature, and denied

19   having any interest in someone of her age or appearance, that it "does nothing for him sexually."

20   (RT 966.) Moreover, just because the magazines turned him on sexually does not mean that

21   petitioner intended to go have sex with someone barely eighteen or, more specifically, that he

22   intended to engage in lewd and lascivious acts with an 11 year old who voluntarily insisted on

23   steering the car and in the presence of her 10 year old brother.

24             The Ninth Circuit has recently issued an opinion in a federal criminal appeal

25   concerning the alleged wrongful admission of five stories contained within the defendant's PDA

26   upon his arrest for traveling across state lines with intent to engage in a sexual act with a minor

24

and using an interstate facility to attempt to persuade a minor to engage in sexual acts.  See
United States v. Curtin, 489 F.3d 935 (9th Cir. 2007).  In Curtin, the court found certain material
contained in the defendant's PDA relevant because "Curtin's possession in his PDA of this
material at the time of his intended encounter with Christy clearly illuminated his thoughts and
his subjective intent to carry out his daddy/daughter sexual initiation escapades with a juvenile,
not an adult."  Curtin, 489 F.3d at 949.  The court stated that its holding should not be interpreted
as a holding

> (1) that the simple possession of any book or written materials
> generically similar to a charged crime is automatically admissible
> against the possessor defendant, or (2) that all pornography or
> obscenity in the possession of a defendant in these cases is
> admissible without undergoing the scrutiny required of Rules 401
> and 403.

Id. at 956.

Unlike Curtin, petitioner did not have the magazines near him during the events in
question.  It is undisputed that petitioner's magazines were found in his bedroom nightstand (RT
794) and that petitioner told the children to stay out of his bedroom.  (RT 380-81.)  The lewd and
lascivious acts at issue here allegedly occurred in petitioner's car driving from Raina's home and
to the liquor store.

In addition, unlike Curtin, there was no other evidence presented that
demonstrated petitioner's interest in pornography meant he intended to act out those interests
with a young girl.  In Curtin, the defendant had engaged in internet communication with the
potential victim in an apparent attempt to solicit a meeting in a chat channel labeled
"ltgirlsexchat."  Id. at 937.  There was no evidence admitted here to make an additional
connection between the pornography and the alleged lewd and lascivious acts in the car.

Moreover, the trial court in this case did not scrutinize the magazines to determine
whether the magazines portrayed a prepubescent 11 year old girl such that only those relevant
portions would be admitted, or to excise any irrelevant, inflammatory passages concerning sexual
acts not at issue herein.  The Curtin court held that in order to properly weigh prejudice under

1   Rule 403, the court was required to read each story and only admit those particularly relevant

2   portions of the stories to avoid the prejudice that would come from other, clearly prejudicial,

3   passages contained in the stories.  The <u>Curtin</u> court reversed and remanded the case with

4   instructions "to not only read each of the stories under consideration from start to finish, but also

5   assiduously to reevaluate their unedited admissibility in the light of Rule 403's concern about

6   redundancy."  <u>Curtin</u>, 489 F.3d at 957.

7          Here, we do not know the express contents of the magazines.  The focus of the

8   admission of the magazines during the prosecution's case in chief was simply their titles.  The

9   magazines were placed in a brown bag.  (RT 793.)  The trial judge briefly reviewed the

10   magazines, but made no comments on the record as to their content.  (RT 794.)  However, all

11   three magazines were admitted into evidence and the jury room.  (RT 793-94; <u>see also</u> RT 707.)

12   Thus, having found that the magazines were relevant to petitioner's intent, the trial court erred in

13   its determination that the probative value of this evidence outweighed the prejudice to petitioner

14   because it failed to review the magazines and admit only that portion connected to the crime with

15   which petitioner was charged, if such existed.

16          The erroneous admission of this prejudicial evidence unfairly tipped the scales

17   against petitioner, particularly with regard to the intent element of the lewd and lascivious

18   charges.  There was scant evidence of intent in the trial testimony; that is, that the "touching was

19   done with the specific intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of

20   that person or the child."  (RT 1237.)  The victim testified she was voluntarily sitting on

21   petitioner's lap while attempting to steer the car in the presence of the victim's brother.  Physical

22   contact was unavoidable.  Given the purient nature of these magazines and the matchbook and

23   their irrelevance, their admission had a substantial and injurious effect on determining the jury's

24   verdict.

25          In light of the foregoing, this court finds that the admission of the magazines and

26   matchbook violated the United States Constitution because the magazines were irrelevant and

1  prejudicial, violating petitioner's due process rights and rendering his trial fundamentally unfair,

2  Estelle, 502 U.S. at 62; McKinney, 993 F.2d at 1378, and their admission had a substantial and

3  injurious effect on determining the jury's verdict.  Brecht, 507 U.S. at 619.  As petitioner's

4  counsel noted, "Mr. Holley was impugned as a weapon-toting, smut-reading, alcoholic.  The

5  repeated admission of irrelevant and prejudicial evidence presented Mr. Holley to the jury as a

6  man of bad character, who could not be trusted and who must be guilty of something."  (Traverse

7  at 25.)  This portrayal deprived petitioner of a fair trial, unfairly tipping the scales on a very close

8  case.  This claim should also be granted.

9                      ii.  Admission of Weapons Evidence

10                 Petitioner alleges the trial court violated his federal constitutional right to due

11  process by improperly admitting evidence showing petitioner had possessed weapons.  Petitioner

12  specifically objects to the following:

13         Officer Hartman testified that he found three black powder pistols
           and a box of knives in [petitioner's] residence when it was
14         searched on August 12, ten days after the alleged incident.  (RT
           706-707.)
15
           The prosecutor argued that the guns and knives corroborated Raina
16         and that the jury should reject [petitioner's] denial of guilt about
           the molestation because 'he lied to Officer Shouten about the
17         guns.'  (RT 1253.)  He also urged the jury to consider that
           [petitioner] lied when he told the officer that he had some small
18         knives.  (RT 1254.)  In rebuttal the prosecutor again argued that the
           gun and knife evidence established that [petitioner] is a liar.  (RT
19         1294-1295.)

20  (Amended Petition at 13 (footnote omitted).)  Petitioner argues that because none of these

21  weapons were used to commit any of the crimes at issue herein, these weapons were irrelevant to

22  any issue at trial and related only to petitioner's character as a violent person.  (Id. at 19.)

23  Although the appellate court found these weapons relevant to the victim's state of mind in the

24  terrorist threat charge, petitioner notes that the alleged terrorist threat occurred in the car, away

25  from his residence, and that California law required the prosecution to prove an immediate

26  /////

1  prospect of execution (<u>citing</u> <u>People v. Garrett</u>, 30 Cal.App.4th 926, 967 (1994) (quoting

2  California Penal Code § 422) .

3          The appellate court addressed this claim as follows:

4          [Petitioner] was charged with making a terrorist threat in violation
           of section 422.  To  establish such a violation, the prosecution must
5          prove not only the acts and intent of the [petitioner], but also the
           mental state of the victim.  (<u>People v. Allen</u> (1995) 33 Cal.App.4th
6          1149, 1156; <u>People v. Garrett</u> (1994) 30 Cal.App.4th 962, 966.)
           Specifically, the prosecution must show "the nature of the threat,
7          both on 'its face and under the circumstances in which it is made,'
           was such as to convey to the victim an immediate prospect of
8          execution of the threat and to render the victim's fear reasonable."
           (<u>Garrett</u>, <u>supra</u>, at p. 967, quoting § 422.)
9
           [Petitioner] contends there was no evidence the knives or guns
10         were in the car when [petitioner] allegedly made the threats and no
           evidence he used the weapons to threaten the children.  This
11         argument is unavailing.

12         Section 422 does not require an immediate ability to carry out the
           threat or even that weapons be involved in the threat.  (<u>People v.</u>
13         <u>Lopez</u> (1999) 74 Cal.App.4th 675, 679.)  It does, however, require
           the victim to reasonably be in sustained fear from the threat.  To
14         determine whether the threat was sufficiently "unequivocal,
           unconditional, immediate and specific" that it placed the victim in
15         such sustained fear, the jury must evaluate all the surrounding
           circumstances.  (§ 422; <u>People v. Mendoza</u> (1997) 59 Cal.App.4th
16         1333, 1340; <u>People v. Martinez</u> (1997) 53 Cal.App.4th 1212, 1218,
           1220.)
17
           Contrary to [petitioner's] assertion, his possession of weapons, and
18         Raina's knowledge of that possession, was a relevant circumstance
           for the jury to consider in assessing whether she was reasonably in
19         sustained fear for her, or her brother's, safety.  This was a fact
           which bore a direct relationship to an element of the crime charged,
20         and was thus "relevant to prove some fact . . . other than
           [petitioner's] disposition to commit" the crime.  (Evid. Code,
21         § 1101, subd. (b).)

22         We also cannot say the probative value of the weapons was
           outweighed by their prejudicial effect.  First, the weapons were the
23         primary basis to establish a crucial element of the offense, namely
           Raina's mental state.  Second, the jury acquitted [petitioner] on this
24         charge.  Given the acquittal, it would be nonsensical to say the
           weapons were substantially more prejudicial than probative.

25  /////

26  /////

28

1          Accordingly, the trial court did not abuse its discretion in admitting
2          the guns and knives.  (Garrett, supra, 30 Cal.App.4th at p. 967.)

3  (Opinion at 18-19 (footnote omitted).)

4         As noted above, the admission of evidence at trial may violate due process only if

5  "there are no permissible inferences the jury may draw from the evidence."  Jammal, at 920.  The

6  permissible inference raised by this evidence was that Raina was truthful when she testified she

7  saw weapons in petitioner's house and that Raina had reason to fear when petitioner, in the car,

8  allegedly stated he would kill her and her brother Matthew.  (RT 231-34.)  Raina's credibility

9  was at issue herein.  The defense attempted to portray Raina as a liar.  The second rationale, that

10  the fact that petitioner possessed weapons confirmed Raina had reason to fear petitioner when he

11  allegedly threatened her in the car, is more attenuated.  However, in light of the terrorist threat

12  charge, this court cannot find it was an impermissible inference.  Therefore, because there was a

13  permissible inference the jury could draw from this evidence, this court cannot find that its

14  admission was error.

15         In light of the foregoing, this court finds that the appellate court's decision with

16  respect to whether the admission of evidence violated the United States Constitution, is not

17  contrary to, nor does it involve an  unreasonable application of clearly established Federal law.

18  Moreover, the decision was not based on an unreasonable determination of the facts.

19  Accordingly, this claim should be denied.

20         c.  Jury Instruction Error

21         Petitioner contends that the trial court compounded the error in admitting the gun

22  and knife by instructing the jury that petitioner's statement he did not own a gun was a falsehood

23  indicating consciousness of guilt pursuant to CALJIC No. 2.03.  The trial court overruled defense

24  counsel's objection to the giving of this instruction.  (RT 1207-08.)

25         On direct appeal, the Third District Court of Appeal addressed this claim as

26  follows:

It is appropriate to give CALJIC No. 2.03[14] when there is evidence the [petitioner] made "[f]alse statements regarding incriminating circumstances . . . prior to trial . . . ." (People v. Louis (1984) 159 Cal.App.3d 156, 160, disapproved on another ground in People v. Mickey (1991) 54 Cal.3d 612, 672 & fn. 9.)  The instruction is proper when the defendant's statement "reasonably had some relevant bearing, although slight and remote, on the issue" of guilt. (People v. Flint (1986) 180 Cal.App.3d 13, 20.)

We first point out the trial court did not instruct the jury that [petitioner] had made a false statement.  Rather, the court instructed the jury in the language of CALJIC No. 2.03.  Nor did the court specify that this instruction applied to any particular statement by [petitioner].  The trial court properly left to the jury the determination of what, if any, statements were false and what, if any, significance to attach to such statements.

[Petitioner] also contends giving CALJIC No. 2.03 was error, as [petitioner's] possession of guns "had absolutely nothing to do with the charged crimes."  The claim that his admittedly false pretrial statement about possessing guns had nothing to do with the charged crimes is patently wrong.  One of the charged crimes was making terrorist threats.  As detailed above, possession of the guns was relevant to that charge.

In addition to the fact that possession of the guns was relevant to a crime charged, this was not the only matter on which the [petitioner's] testimony at trial was inconsistent with his pretrial statements.  [Petitioner] claimed all of the knives in his collection were small blades.  At trial he admitted some of the blades were large.  Again, these weapons were relevant to the terrorist threat charge.

[Petitioner] also did not tell Officer Schouten about the trips back and forth to the children's home or to the liquor store.  These trips were particularly relevant, because it was during these trips Raina and Matthew alleged the inappropriate touchings had occurred. The jury could have reasonably inferred [petitioner's] omission of these trips from his pretrial statement to Officer Schouten was a deliberate effort to mislead the police, discredit the children and deflect suspicion from himself.

[Petitioner's] argument also appears predicated on the belief that CALJIC No. 2.03 can be given only when the [petitioner's] pretrial

---

[14]   The jury instruction at issue reads as follows:  "If you find that before this trial, the Defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt.  However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."  (RT 1228; CALJIC 2.03.)

1    statements are inconsistent with his trial testimony.  This position
2    has already been rejected by our Supreme Court.  (People v.
     Kimble (1988) 44 Cal.3d 480, 495-498.)

3    [Petitioner] relies on People v. Edwards (1992) 8 Cal.App.4th 1092
     in support of his position.  We agree that Edwards correctly states
4    the law, but do not agree that it supports [petitioner's] position.

5    Edwards holds CALJIC No. 2.03 should be given "when there
     exists evidence that the defendant prefabricated a story to explain
6    his conduct."  (Edwards, supra, 8 Cal.App.4th at p. 1103.)  Other
     evidence, including the testimony of other witnesses, can establish
7    the falsity of those pretrial statements, even where the [petitioner's]
     testimony at trial is largely consistent with his pretrial statements.
8    (Ibid.)  Under this standard, "[i]f the jury here believed the
     testimony of other witnesses, it could reasonably have found
9    [petitioner's] pretrial statements were willfully false and
     deliberately misleading.  From this, the jury could have inferred a
10   consciousness of guilt.  The trial court properly instructed the jury
     [with] CALJIC No. 2.03."  (Id. At p. 1104.)

11

12   (Opinion at 20-23.)

13          A challenge to jury instructions does not generally state a federal constitutional

14   claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021

15   (1986) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195,

16   1197 (9th Cir. 1983).  Habeas corpus is unavailable for alleged error in the interpretation or

17   application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805,

18   814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  However, a

19   "claim of error based upon a right not specifically guaranteed by the Constitution may

20   nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire

21   trial that the resulting conviction violates the defendant's right to due process."  Hines v.

22   Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir.

23   1980), cert. denied, 449 U.S. 922 (1980)); see also Lisenba v. California, 314 U.S. 219, 236

24   (1941).

25          In order to warrant federal habeas relief, a challenged jury instruction "cannot be

26   merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

                                                    31

1   process right guaranteed by the fourteenth amendment." <u>Prantil v. California</u>, 843 F.2d 314, 317

2   (9th Cir. 1988), <u>cert. denied</u>, 488 U.S. 861 (1988) (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 146

3   (1973)).  To prevail, petitioner must demonstrate that an erroneous instruction "'so infected the

4   entire trial that the resulting conviction violates due process.'" <u>Estelle</u>, 502 U.S. at 72 (quoting

5   <u>Cupp</u>, 414 U.S. at 147).  In making its determination, this court must evaluate the challenged jury

6   instructions "'in the context of the overall charge to the jury as a component of the entire trial

7   process.'" <u>Prantil</u>, 843 F.2d at 817 (quoting <u>Bashor v. Risley</u>, 730 F.2d 1228, 1239 (9th Cir.

8   1984), <u>cert. denied</u>, 469 U.S. 838 (1984)).  Further, in reviewing an allegedly ambiguous

9   instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has

10  applied the challenged instruction in a way' that violates the Constitution." <u>Estelle</u>, 502 U.S. at

11  72 (quoting <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990)).

12          If an error is found, the court must  also determine that the error had a substantial

13  and injurious effect or influence in determining the jury's verdict before granting relief in habeas

14  proceedings.  <u>See</u> <u>Brecht</u>, 507 U.S. at 637.

15          This court cannot find that the CALJIC 2.03 was given in error.  As noted by the

16  appellate court, the instruction was given based on discrepancies between petitioner's pretrial

17  statements and his statements at trial.  This instruction was given to the jury to enable them to

18  determine whether petitioner had, in fact, made false statements.  The jury is presumed to have

19  followed that instruction.  <u>Drayden v. White</u>, 232 F.3d 704, 713 (9th Cir. 2000).  The instruction

20  did not specifically direct the jury's attention to petitioner's initial denial of possessing guns.[15]

21          Moreover, this did not require the jury to make any findings, cast aspersions on

22  petitioner's testimony, or advise the jury to give his testimony less weight than the prosecution

23  witnesses.  Instead, the instructions simply allowed the jury, if it found that petitioner made

24  _____

25      [15]  Despite petitioner's arguments to the contrary, his possession of weapons related to the
    terrorist threat charge, and the fact that he initially denied, then later admitted, possessing
26  weapons was relevant to the jury's assessment of petitioner's credibility.

1  willfully false or misleading statements, to consider that fact as tending to prove consciousness of

2  guilt.  The giving of these instructions did not violate petitioner's constitutional rights.  See

3  Turner v. Marshall, 63 F.3d 807, 820 (9th Cir. 1995) ("So long as [CALJIC No. 2.03] does not

4  state that inconsistent statements constitute evidence of guilt, but merely states that the jury may

5  consider them as indicating a consciousness of guilt, the instruction would not violate

6  constitutional rights."), overruled on other grounds by Tolbert v. Page, 182 F.3d 677 (9th Cir.

7  1999); United States v. Perkins, 937 F.2d 1397, 1401-02 & n.2 (9th Cir. 1991) (same).  The jury

8  had to find, independently, that petitioner made willfully false or misleading statements, before

9  the instruction took effect.  If the jury did not so find, the instruction was irrelevant.  This

10  instruction preserved the government's responsibility to prove the elements of its case, and was

11  consistent with established federal law.  The adjudication of this claim by the California Court of

12  Appeal is not contrary to federal law and should not be set aside.

13         d.  Improper Admission of Evidence of Alleged Battery

14         Finally, petitioner alleges that the admission of evidence of his alleged battery of

15  Renie Manville, petitioner's girlfriend, violated his federal due process rights.

16         On direct appeal, the Third District Court of Appeal found that the trial court

17  erred by allowing the prosecution to "exceed the scope of direct examination of a defense

18  character witness by inquiring about an incident in which the witness accused [petitioner] of

19  battering her." (Opinion at 23.)  The scope of direct examination was exceeded because the issue

20  of petitioner's violence and character when drinking was first raised by the prosecution through

21  improper cross-examination.  The appellate court also found that the evidence would not have

22  been admissible under California Evidence Code § 1101.  (Opinion at 23-25.)

23         However, the appellate court went on to find that the error did not require reversal

24  because Renie Manville was a character witness, not a percipient witness, and she was not

25  [petitioner's] only character witness as to his general reputation for truthfulness and good

26  reputation with children.  (Id. at 25-26.)  The court further found that use of the uncharged

1    conduct of [petitioner] was not so prejudicial as to warrant reversal because it involved a battery

2    and in the instant case, no count on which [petitioner] was convicted involved an allegation of

3    violence.  (Id. at 26.)  The appellate court concluded that while the admission of this evidence

4    was error, it was "not reasonably probable a more favorable verdict would have resulted had the

5    evidence been excluded."  Id. at 26.

6    _____ Federal courts may not interfere with a state evidentiary ruling unless the resulting

7    admission or prohibition of evidence "so fatally infected the proceedings as to render them

8    fundamentally unfair."  Jammal v. Van De Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  See also

9    Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994).  The admission of evidence at trial

10   may violate due process only if "there are no permissible inferences the jury may draw from the

11   evidence."  Jammal, at 920.  Due process violations warranting federal interference are found

12   "only where criminal trials in state courts are conducted in such a manner as amounts to a

13   disregard of that fundamental fairness essential to the very concept of justice . . . ."  Pike v.

14   Dickson, 323 F.2d 856, 860 (9th Cir. 1963).

15           As noted by the court of appeal, the admission of this evidence was error.  This

16   court must now determine whether this error had a "substantial and injurious effect or influence

17   in determining the jury's verdict."  Brecht v. Abrahamson, 507  U.S. 619, 637 (1993).  In

18   determining whether an error is harmless, "the question is not 'were they [the jurors] right in their

19   judgment, regardless of the error or its effect on the verdict.  It is rather what effect the error had

20   or reasonably may be taken to have had upon the jury's decision.' "  Wade, 29 F.3d at 1322

21   (quoting Brecht, 507 U.S. at 642-43 (Stevens, J., concurring)).  An error is not harmless if we are

22   "in grave doubt" as to whether the error had "substantial and injurious effect or influence."

23   O'Neal, 513 U.S. at 435.

24           Upon review of the record, this court cannot find that the admission of the

25   collateral evidence had a substantial and injurious effect on the jury's verdict.  Ms. Manville was

26   one of two character witnesses called by the defense.  David M. Flynn testified that he has two

1   children, a girl aged 12, and a boy aged 4, and he had known petitioner for over ten years.  (RT

2   1047.)  Mr. Flynn testified that for about six months he lived with petitioner, and that during that

3   time, his two children stayed with him at petitioner's home for three nights each week.  (RT

4   1048.)  During that time, Mr. Flynn reported there were no allegations of inappropriate behavior

5   by petitioner, and that his children enjoyed and grew close with petitioner.  (RT 1048.)  Mr.

6   Flynn also testified that petitioner worked for him for about five of the ten years he had known

7   petitioner.  (RT 1049.)  Mr. Flynn stated petitioner was a "straightforward, honest person" he

8   could trust.  (RT 1049.)  Mr. Flynn testified he did not believe petitioner was a danger to children

9   and that petitioner had not acted inappropriately with his own daughter.  (RT 1050.)

10          In addition, the uncharged battery was dissimilar to the alleged conduct at issue

11  herein, and was not so inflammatory as to have substantially affected the jury's verdict.  The

12  record reflects that the prosecution did not rely on petitioner's battery offense to establish

13  petitioner's guilt on any of the offenses.  Rather, the prosecution cautioned the jury against the

14  improper use of this evidence.[16]  (RT 1257.)  Finally, the jury acquitted petitioner of the only

15  charge related to violence, the charge of making terrorist threats.  Thus, this claim must fail.

16          In accordance with the above, IT IS HEREBY RECOMMENDED that:

17          1.  Petitioner's application for a writ of habeas corpus be granted based on

18  petitioner's claims of admission of inflammatory and prejudicial evidence and the wrongful

19  exclusion of critical evidence necessary to provide petitioner the opportunity to cross-examine

20  the victim.

21  /////

22

---

23          [16]  The prosecutor specifically told the jury:  "Ms. Manville, first of all, she flat out lied.
24  She's trying to make Mr. Holley look like something he's not.  Flat out directly lied to you.  She
    apparently thought maybe the paperwork wasn't around anymore, but she got called on it.  You
25  can consider that as going to her credibility.  Now, caution about that.  In fairness, you shouldn't
    consider that as going to Mr. Holley since you shouldn't say, "Oh, he hit her.  He's a bad guy, so
26  he must be guilty of this."  That wouldn't be fair.  That evidence was brought to you simply to
    address Miss Manville's absolute lack of credibility."  (RT 1257.)

1        2.  Respondent be directed to release petitioner from parole unless proceedings in

2 the state court leading to retrial are commenced within sixty days from the date of any order by

3 the district court adopting these findings and recommendations.

4        3.  In all other respects the petition be denied.

5        These findings and recommendations are submitted to the United States District

6 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

7 after being served with these findings and recommendations, any party may file written

8 objections with the court and serve a copy on all parties.  Such a document should be captioned

9 "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

10 failure to file objections within the specified time may waive the right to appeal the District

11 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

12 DATED:  September 13, 2007.

13

14

15 UNITED STATES MAGISTRATE JUDGE

16 001; holl0310.157

17

18

19

20

21

22

23

24

25

26